2020 IL App (2d) 180842-U
No. 2-18-0842
Order filed March 18, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the Circuit Court |
| ) | of Kane County. |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | No. 16-CF-1970 |
| ) | |
| ALBERTO SEPEDA, ) | Honorable |
| ) | John A. Barsanti, |
| Defendant-Appellant. ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's two convictions for aggravated kidnapping were properly entered where the State proved beyond a reasonable doubt that defendant secretly confined a woman in a car during a high speed chase while she held onto her one-year-old child, and where the evidence was not sufficient to alter the manifest weight of the evidence and establish that defendant was the biological parent of the child or was the child's legal guardian.   Affirmed.

¶ 2    A jury found defendant, Alberto Sepeda, guilty of first-degree murder of Norbert Gutierrez (720 ILCS 5/9-1(a)(2) (West 2016)), home invasion (*id.* at 19-6(a)(3)) and two counts of aggravated kidnapping (*id.* at 10-2(a)(6)) of Bianca Miranda and her child, E.S.   The trial court sentenced defendant to 65 years' imprisonment for the first-degree murder conviction, that

included an automatic 25-year firearm enhancement. The court also sentenced defendant to three separate 21-year prison terms for the home invasion and two aggravated kidnapping convictions, that included an automatic 15-year firearm enhancement for each conviction. The 21-year prison terms run concurrently, but consecutively with the 65-year prison term. .

¶ 3    On appeal defendant argues (1) the State presented insufficient evidence regarding the aggravated kidnapping of Bianca Miranda because there was insufficient evidence that defendant secretly confined her, and (2) defendant's conviction of aggravated kidnapping in connection with E.S. must be vacated because biological parenthood is a defense to this offense when, as here, the victim is under 13-years old. For the reasons that follow, we affirm.

¶ 4                                I. BACKGROUND

¶ 5    In view of the nature of the issue on appeal, only the necessary facts are presented. At trial Miranda testified as follows. Miranda and defendant had been dating for approximately four years and had been living with defendant's parents along with Miranda's one-year-old daughter, E.S. According to Miranda, in July 2016, defendant struck her in the eye with a cellphone, which, after two surgeries, resulted in a 50 percent vision loss in her left eye. On November 12, 2016, after defendant and Miranda argued, Miranda decided to leave the apartment with E.S. and spend the night with Marisa Munoz, a close family friend. That night, Miranda slept in the basement with her daughter while Munoz slept in the living room with her children. Munoz's mother and stepfather, Yolanda and Norbert Gutierrez, slept upstairs.

¶ 6    Munoz testified that on November 12, 2016, in the early afternoon, Miranda called her crying and asked Munoz to pick her up from her home. Munoz agreed and, later that afternoon, she picked Miranda up on her way to church. Miranda came outside with E.S., a car seat, and two packed bags, which they put in Munoz's car. They went to a church function where they met

up with Norbert, Yolanda, and Munoz's children. After the church function they all went to the Gutierrez's home on Morgan Street.

¶ 7 That night, Miranda and E.S. slept in the basement and Munoz and her children slept in the living room; four or five steps from the front door. Everybody went to bed. Then, at approximately 3:45 a.m. Munoz woke up when she heard loud banging on the front door. When the banging became "harder," she cracked open the door about five inches to see who was beating on it. Defendant put his foot in the opening of the door and shoved the door open with his shoulder, causing Munoz to step backwards. Defendant then opened the front door and pushed his way into the house. Munoz told defendant that he needed to leave and that he was not welcome in the home. At that point defendant started swearing at Munoz and told her that he needed to "get his kid." Munoz told defendant repeatedly that he had to leave, that he was not welcome. Defendant swore at Munoz and pushed her.

¶ 8 Yolanda came out of her bedroom, told defendant to leave the house, and went to the phone and dialed 911. Then Norbert came out of the bedroom, walked to the front door, and told defendant he was not welcome in his house and that he needed to leave. Defendant just stood there and refused to leave. Norbert pushed defendant out the front door. Munoz heard Yolanda on the phone with 911 and told Norbert that the police were on their way.

¶ 9 At this point Norbert and defendant were standing in the middle of the driveway. As Munoz told Norbert about the police, Munoz saw "the fire from the gun hit [Norbert's] chest. And he fell down." After defendant shot Norbert, defendant stepped towards him, lifted his gun, and said, "Who is the tough guy now," and defendant fired a second shot into the back of Norbert's head. Then, Munoz shut and locked the front door.

¶ 10    Defendant kicked open the door, waving his gun saying, "Now what?  Now what?  Fall back."    Defendant grabbed Munoz's shirt, put his gun to her neck, and said, "where's [Miranda]? Get [Miranda]."   Defendant screamed for Miranda, dragged Munoz through the kitchen and into the basement.   Miranda was hiding in the laundry area and ran when she saw defendant. Defendant yelled, "Where the f**k are you?  [Miranda] get the f**k over here."   Munoz ran upstairs to check on her children.   Defendant dragged Miranda, who was holding E.S., up the basement stairs and into the kitchen.   Miranda went limp and collapsed on the kitchen floor. Defendant yelled, "Get up.  We got to f*****g go."   Miranda got up, and defendant began walking them out of the house.   Miranda fell again when she got to the front door, causing E.S. to hit her head.   Defendant grabbed Miranda and said, "I will pop your ass, too."   Defendant pulled Miranda out of the house and forced her and E.S. into his car, which was parked in front of the house.

¶ 11    Miranda also testified, as follows.   On November 13, 2016, at approximately 3:30 a.m., Miranda heard noises coming from upstairs, prompting her to go upstairs where she saw defendant and Munoz arguing at the front door.   Miranda went back downstairs to the basement and then heard two gunshots.   Miranda clung to E.S. as Munoz's children came downstairs.   Then, defendant came down the basement stairs with a gun.   He kept yelling, "let's go," but Miranda did not want to go with defendant.   Munoz told Miranda that the police were on their way. Miranda attempted to stall by circling the basement, but defendant grabbed her shoulder and began to pull or drag her up the stairs as she carried E.S.   Miranda did not go willingly and tried to stall but defendant pointed the gun towards Miranda's left shoulder and said that he would "pop" her too if she did not go with him.   Miranda testified that she felt the weight of the gun on her shoulder

and she feared for E.S.'s safety. Miranda did not have time to put on shoes, take a diaper bag, or grab a car seat.

¶ 12    While Miranda walked towards defendant's car, she saw Norbert's body in the driveway. Miranda was in shock and was trying to stall so she circled the car twice but then entered the car after defendant ordered her to do so. As soon as Miranda was inside the car with E.S., defendant sped off. Miranda was in the backseat holding E.S., who was crying in Miranda's arms.

¶ 13    Mitra Kalekar, M.D., testified that Norbert suffered two gunshot wounds: a head wound, and a chest wound. The head wound was a contact wound, meaning that the muzzle of the firearm was touching Norbert's head when it was fired.

¶ 14    Elgin Police Officer Jeff Wiltberger testified that on November 13, 2018, at 6:50 a.m., he interviewed defendant at the Elgin police station. Defendant had a scratch on his right leg and knee, and minor scratches on his left knee. There were no injuries to defendant's face.

¶ 15    Defendant testified that, on November 12, 2016, he went to a party in Rockford and he wore a holstered gun that evening because he had never been to a Rockford party. Defendant left the party at 12:45 a.m. on November 13, 2016, and he and his friends played video games at his house. They wanted to smoke marijuana, but defendant's marijuana was missing. Defendant believed Miranda might have taken it when she went with Munoz. Defendant called Miranda more than once, but she did not answer her phone. Defendant drove to Munoz's home with his loaded gun to get his marijuana from Miranda and to see E.S. He parked his car in front of Munoz's home and called Miranda to come outside, but she did not answer. Defendant called Munoz's phone, but she did not answer.

¶ 16    Defendant knocked on the front door, Munoz asked who it was, defendant identified himself, and Munoz opened the front door and let him in the house. Defendant asked if Miranda

was there and Munoz said, "Yeah. I am going to get her." Munoz called for Miranda. The conversation between defendant and Munoz was calm. Then Norbert exited his bedroom and yelled, "What is going on?" Norbert told defendant that he had to leave "his" house. Defendant turned around and walked toward the front door to leave when Norbert grabbed defendant's shoulder, spun him around, and called defendant "young punk."

¶ 17    Defendant and Norbert wrestled inside the house and eventually outside on the driveway. Norbert severely beat defendant "[p]retty much everywhere *** [t]he back of [his] head, [the] front of [his] body, [and his] face." Munoz yelled, "Let 'em fight." Norbert threw defendant to the ground, jumped on defendant, removed defendant's glasses, and punched defendant in the face. As they struggled on the front porch, Norbert yelled, "Go get my shotgun." Norbert grabbed for defendant's gun which was concealed in a holster under defendant's jacket. Fearing that Norbert would shoot defendant, he removed his gun to scare Norbert. But that did not deter Norbert who continued to hit defendant. Consequently, defendant shot Norbert while he was on top of defendant and defendant was on his back on the ground.

¶ 18    Defendant also testified that after the shooting he was "freaked out" but put on his glasses and knocked on the front door to get help for Norbert. Norbert said, "I can't breathe," and defendant wanted to help him. Defendant extended a hand to Norbert. Norbert, though, stabbed defendant's left hand with a sharp object. Defendant fired his gun close to Norbert's head. Defendant cried, panicked, and prayed "and asked for forgiveness and thought of I am going to jail for self-defense." Defendant knocked on the front door and one of Munoz's children let him in the house. Miranda was at the bottom of the stairs standing next to E.S. who was in her car seat.

¶ 19    On May 10, 2018, the jury found defendant guilty of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2016)), home invasion (*id*. at 19-6(a)(3)) and two counts of aggravated kidnapping (*id*. at 10-2(a)(6)).    On June 8, 2018, defendant filed a motion for judgment notwithstanding the verdict or for a new trial, which the trial court denied on June 27, 2018.    On July 30, 2018, the court sentenced defendant. On August 29, 2018, defendant filed a post-sentencing motion, which the court denied on September 27, 2018.    On October 12, 2018, defendant filed a timely notice of appeal.

¶ 20                                        II. ANALYSIS

¶ 21                    A. Aggravated Kidnapping – Secret Confinement

¶ 22    Defendant argues that the State presented insufficient evidence regarding the aggravated kidnapping of Miranda because there was insufficient evidence that defendant secretly confined her.    Initially, we note that, defendant failed to raise this issue in his posttrial motion.    While normally a defendant who fails to object at trial and fails to raise the issue in a posttrial motion forfeits the issue for purpose of appeal (People v. *Enoch*, 122 Ill. 2d 176, 186 (1988)), when a defendant is complaining of an error that goes to the sufficiency of the evidence, it is not subject to the forfeiture rule.    *People v. Enoch*, 122 Ill. 2d 176, 190 (1988); *People v. Washington*, 343 Ill. App. 3d 889, 899 (2003).    Thus, we will address defendant's argument.

¶ 23    The State has the burden of proving beyond a reasonable doubt each element of an offense. *Jackson v. Virginia*, 443 U.S. 307, 315-16, 99 S. Ct. 2781 (1979); *People v. Gray*, 2017 IL 120958, ¶ 35.    In determining the sufficiency of the evidence, a reviewing court must consider whether " ' "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.)    *People v. Drake*, 2019 IL 123734, ¶ 21 (quoting *People v. Ross*, 229 Ill.

2d 255, 272 (2008), quoting *Jackson*, 443 U.S. 307, 319, 99 S. Ct. 2781, (1979)). A guilty verdict may be supported not only by the evidence itself, but also by any reasonable inferences that may be drawn from the evidence. *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234, ¶ 34. It is not the role of the reviewing court to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Therefore, a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Id.*

¶ 24 Here, to prove defendant committed aggravated kidnaping of Miranda, the State had to establish that he knowingly and secretly confined Miranda against her will while being armed with a firearm. 720 ILCS 5/10-1(a)(1), 10-2(a)(6) (West 2016). On appeal, defendant contests whether the evidence sufficiently established that he secretly confined Miranda because the State did not establish that she was prevented from using her cellphone in his car during the police chase.

¶ 25 Although the statute does not define secret confinement, our supreme court has defined the term "secret" as "concealed, hidden, or not made public." *People v. Gonzalez*, 239 Ill. 2d 471, 479 (2011). The term "confinement" is defined as the act of imprisoning or restraining someone. *Id.* Thus, the secret confinement element of kidnapping may be established by evidence of the secrecy of the confinement or the secrecy of the location of the confinement. *Id.* Confinement includes, but is not limited to, enclosure within something, most commonly a building or an automobile. *People v. Siguenza–Brito*, 235 Ill. 2d 213, 227 (2009). Our supreme court has

noted that "secret confinement can be shown through evidence that the defendant isolated the victim from meaningful contact with the public." *Gonzalez*, 239 Ill. 2d at 480.

¶ 26    Here, the evidence established that defendant forced Miranda out of the house while she felt the weight of his gun on her left shoulder, threatening her that he would "pop" her too if she did not go with him.   Miranda complied because she feared for her infant daughter.   Miranda entered defendant's car without time to put on her shoes, take a diaper bag, or grab a car seat for E.S.   There was no evidence Miranda had a cellphone while in defendant's car.   Defendant then sped off, exceeding 80 miles-an-hour, with a gun in the car.   Defendant drove through fields and drove through 8-12 stops, all the while ignoring Miranda's pleas to stop.   Thus, even if Miranda had a cellphone, nothing in the record indicates that defendant would have allowed her to use it or that she could have managed to use it while caring for E.S., who was in the backseat of the vehicle without a car seat.   Accordingly, we determine that the State proved beyond a reasonable doubt that defendant secretly confined Miranda.

¶ 27              B. Aggravated Kidnapping – Defense of Biological Parent

¶ 28    Next, defendant argues that we must vacate his aggravated kidnapping conviction because the State failed to prove that defendant was not E.S.'s biological parent or that Miranda had sole legal guardianship of E.S.   The State contends that it proved that Miranda was E.S.'s sole legal guardian.

¶ 29    The provisions of the aggravated kidnapping statute that relate to this appeal are:

> "(a) A person commits the offense of aggravated kidnaping when he or she commits kidnapping and:
>
> * * *

> (2) takes as his or her victim a child under the age of 13 years ***."    720
>
> ILCS 5/10-2 (West 2016).

The provisions of the kidnapping statute that relate to this appeal are:

> "(a) Kidnaping occurs when a person knowingly"
>
> (1) and secretly confines another against his or her will;
>
> * * *
>
> (b) Confinement of a child under the age of 13 years, *** is against that child's or person's will within the meaning of this Section if that confinement is without the consent of that child's or person's parent or legal guardian."    720 ILCS 5/10-1 (West 2016).

¶ 30    The term "parent" is not defined by the kidnapping statute.    *People v. Algarin*, 200 Ill. App. 3d 740, 746 (1990).    Given its plain and ordinary meaning, the term "parent" in the kidnapping statute means father or mother related by blood.    *Id*.    Biological parenthood alone is a defense to aggravated kidnapping.    *Id*. at 749-50.

¶ 31    As an initial matter, we note that defendant did not raise his alleged biological parentage as a defense at trial or in his posttrial motion.    Rather, defendant now raises this defense for the first time on appeal.    Because defendant failed to raise this defense in the trial court, he has forfeited the defense on appeal.    See *People V. Bardsley*, 2017 IL App (2d) 150209, ¶ 17. However, the State does not argue forfeiture, and we will consider the argument.    See *People v. Williams*, 193 Ill. 2d 306, 347 (2000).    ("The rules of waiver are applicable to the State as well as the defendant in criminal proceedings").

¶ 32    Even if defendant had raised the defense he now raises, taking the evidence in the light most favorable to the State, the record does not support defendant's defense that he was E.S.'s biological parent.    Defendant notes that Miranda testified that she'd been dating defendant for

nearly four years when the incident occurred and that E.S. was one-year old. Defendant also notes that Miranda, E.S., and defendant lived with defendant's parents when the incident occurred, and E.S.'s last name is the same as defendant's last name. However, none of these facts establishes that defendant and E.S. were related by "blood." See *Algarin*, 200 Ill. App. 3d at 746.

¶ 33 Finally, defendant testified that he signed E.S.'s "birth certificate." However, Miranda testified that defendant did not sign the "birth certificate." Further, the record indicates that what defendant calls a "birth certificate" is an unofficial hospital document and not an official birth certificate. The document states, "[t]his document should be carefully preserved, it is your family's heirloom record of the facts pertaining to your child's birth. The law requires that the original certificate (not this document) be filed with the Vital Statistics Office at _____ from which an official copy may be obtained." The hospital document is a form with blank spaces for the names of the mother and father, among other things. Miranda's full name is handwritten as is defendant's. The handwriting on the document looks similar. Thus, the evidence was not sufficient to alter the manifest weight of the evidence and establish that defendant was the biological father of E.S. or was E.S.'s legal guardian. Therefore, the trial court's judgment of conviction is affirmed.

¶ 34 Defendant cites *Algarin*, 200 Ill. App. 3d 740, to support his argument. In *Algarin*, the appellate court held that the defendant was improperly convicted of aggravated kidnapping his biological daughter. *Id*. at 750. However, in *Algarin*, there was no dispute that the defendant was the girl's biological father and "[t]his fact was also acknowledged by the trial court." *Id*. at 743. Here, nothing in the record conclusively indicates that defendant is E.S.'s biological father, and the trial court did not acknowledge such. Therefore, *Algarin* is distinguishable from this case.

¶ 35                                    III. CONCLUSION

¶ 36    The judgment of the circuit court of Kane County is affirmed.

¶ 37    Affirmed.