2025 IL App (2d) 230543
No. 2-23-0543
Opinion filed November 12, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-931 |
| ANGEL A. LAGRONE, | ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1     After a bench trial, defendant, Angel A. Lagrone, was found guilty but mentally ill of six counts of home invasion (720 ILCS 5/19-6(a)(1), (2), (3) (West 2018)), one count of armed violence (*id.* § 33A-2(a)), three counts of attempted aggravated kidnapping (*id.* §§ 8-4(a), 10-2(a)(2), (5), (6)), one count of aggravated domestic battery (*id.* § 12-3.3(a)), six counts of aggravated battery (*id.* § 12-3.05(a)(1), (d)(1), (f)(1)), and two counts of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A-5), (a)(3)(C)). Defendant was sentenced to concurrent terms of imprisonment. Defendant now appeals, contending that (1) the trial court's findings of guilty but mentally ill were against the manifest weight of the evidence; (2) she was denied effective assistance of counsel; (3) her convictions of attempted aggravated kidnapping must be

reversed because a parent cannot be convicted of kidnapping her own child; and (4) her conviction of aggravated domestic battery must be vacated pursuant to the doctrine of one act/one crime. We affirm in part, affirm as modified in part, reverse in part, and remand.

¶ 2                                    I. BACKGROUND

¶ 3     The 10-year marriage of defendant and her husband, Charles Guyton, was dissolved in 2019. Defendant then moved to California, while Guyton, who was awarded custody of their son, N.G., moved to Aurora, Illinois, where they lived with Guyton's mother (Maria Phillips), and grandmother.

¶ 4     Starting in early 2020, defendant began almost daily calling Aurora police to perform wellness checks on N.G. because, as she later explained, Guyton told her that he was molesting N.G. and was going to start raping him. When the police told her that they would no longer perform the wellness checks, defendant decided to drive to Illinois to take N.G. to a hospital.

¶ 5     Upon arriving in Aurora, defendant stayed at a local motel. She practiced driving to the hospital nearest her motel. She drove past Guyton's house multiple times "trying to figure out how I was gonna get my son out of there." On May 24, 2020, defendant drove through Guyton's neighborhood and walked onto Guyton's property and that of a neighbor. Defendant taped a cell phone to her baseball cap to record her surveillance, which included looking into Guyton's enclosed porch and examining the home's windows.

¶ 6     The following morning, May 25, 2020, defendant returned to Guyton's home with a knife, a baseball bat, a gun, and duct tape. She again taped the cell phone to her cap and recorded the ensuing events. After walking through a neighbor's yard, defendant climbed a fence, entered Guyton's enclosed porch by cutting through a screen window, then opened a door and entered the

house. All the while, Phillips was yelling at defendant to get off her property. Phillips went up the stairs to the second floor and called for Guyton as she continued to demand that defendant leave.

¶ 7 The cellphone taped to defendant's hat was pointed upward and did not capture any faces, but the voices of defendant, Guyton, Phillips, and N.G. can be heard. Defendant struck Phillips on the head with the baseball bat and injured Phillips's arm. When Guyton rushed her to disarm her, defendant repeatedly slashed his scalp with the box cutter. Guyton was able to knock the gun away from defendant and wrestled her to the ground. Phillips called 911, and both she and N.G. fled to a neighbor's house. The police arrived and defendant, Guyton, and Phillips were taken to the hospital.

¶ 8 The State charged defendant with 19 felonies. At trial, the parties informed the court that both sides would be presented largely by stipulation. We turn first to videos entered into evidence to provide a more complete background to the incident. These include recorded interviews with defendant, Guyton, and Phillips. The videos defendant recorded from the day of the incident, and her surveilling the neighborhood the day before, were also entered into evidence.

¶ 9 A. Video Interviews

¶ 10 Kane County Sheriff deputies conducted a series of interviews in the days following the incident. Each was video recorded and entered into evidence without objection.

¶ 11 1. Defendant Interview

¶ 12 Kane County Sheriff's Deputies Andrew Biddle and Edward Catich interviewed defendant on the day of the incident, after she had been released from the hospital. The video-recorded interview lasted approximately two hours. The first quarter-hour of the video is primarily of defendant, with a white sheet covering her head and upper body, resting her head on a table. When the officers entered the room, Biddle reintroduced himself and referred to conversations that he

had with defendant at the hospital. Biddle administered a *Miranda* warning (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and defendant waived her right to remain silent. She clarified that she wanted to speak to the police before speaking to a lawyer in case the lawyer advised her not to speak. Defendant was adamant that she wanted to tell the officers "everything."

¶ 13    During the interview, defendant returned repeatedly to her request that N.G. be examined for proof of sexual assault. She insisted that it was vital that doctors perform a blood test for "date-rape drugs" and administer a "rape kit." Defendant also requested that both she and Guyton be subjected to a lie detector test to show who was telling the truth. She wanted police to ask Guyton "about the child pornography he is recording of my son." Defendant also seemed concerned about how long it would take for Guyton to be brought to justice because she had just recently started a new job in California.

¶ 14    Defendant claimed that Guyton had told her in February 2020 that he was molesting N.G. and planned to rape him. She called the police daily to conduct wellness checks until police told her that they would no longer conduct wellness checks. "After I realized [Guyton] was drugging [N.G.] and after they told me they would no longer do any more well-being checks, I realized I would have to do it myself."

¶ 15    Defendant explained that she planned to drive from California to Illinois to take N.G. to a hospital. She claimed to not have a plan beyond having her son examined for signs of abuse. "The only thing I knew I needed to do was to get him to the hospital as soon as possible. Get some blood drawn and get a rape kit." Defendant left California on May 21, 2020. She could not remember the day she arrived but said that she had stayed at the Hansen's motel in Aurora.

¶ 16    Defendant explained her sense of urgency came from her belief that "everything was escalating." She had thought of taking N.G. to the police first but reasoned that hospital personnel

would contact the police afterward. She explored the area and determined that Rush-Copley Medical Center was the closest to her motel and practiced driving to it. Defendant stated that she had timed the drive to eight minutes and had made several drives past Guyton's house to formulate her plan.

¶ 17     Defendant told deputies that she had been to the property the day before to "figure out how I was gonna get my son out of there." She explained that she wanted to familiarize herself with the house and surrounding area. She hoped to identify where N.G. might be held within the home and find the quickest ways to "get in there and get out quickly." Defendant explained to deputies that she had recorded her reconnaissance by taping a cellphone onto her baseball cap.

¶ 18     The next day, the day of the incident and the interview, defendant returned to the property. When she approached the door, Phillips yelled at her and went inside. Defendant told officers that she used a utility knife to cut through the screen on the door to gain entrance. Phillips retreated upstairs and defendant followed her. She pointed the handgun she had brought at Phillips in hopes that it would stop Phillips from approaching her.

¶ 19     Defendant claimed that she brought weapons to protect herself. She did not want to hurt anyone but needed to defend herself. For example, she pointed a gun at Phillips to keep her from approaching defendant. "If I wanted to kill her that would have been the time I could have literally shot her in the face. I could have shot her [***] I didn't want to shoot her. That was to protect me because she was coming towards me." Defendant did not mention striking Phillips with a baseball bat or cutting/biting her arm.

¶ 20     Turning to Guyton, defendant stated that he attacked her. To defend herself, she "poked" him several times with the box cutter "so he would stay the heck away from me as opposed to using the gun." When asked if she realized that she could have caused great bodily harm to Guyton,

she said she did not realize it. She was only trying to protect herself and her son. As with her description of conflict with Phillips, defendant again stated that she had opportunity to shoot Guyton and did not.

¶ 21    When defendant and Guyton fell to the floor, N.G. came out of an upstairs room. Defendant told her son to call the police. She remembered that N.G. went downstairs with Phillips to call 911. The last thing defendant remembered from the house was being choked by Guyton. She woke up in the hospital.

¶ 22    During the interview, defendant claimed to have video recording of Guyton confessing to abusing N.G. "Everyone has a copy of it, but nobody cares." Defendant claimed that Guyton had been filming his abuse of N.G., including "live editions" over Zoom.

¶ 23    Biddle asked defendant if she felt she had done anything wrong. After the question was repeated, defendant answered:

> "I knew on some level that somewhere in there was [*sic*] some issues. The fact that I was uninvited. That might be trespassing or something. But like I said before, the risk versus the reward didn't matter. My son was being raped continuously and it's getting worse and worse. So if I had to put myself in harm's way to make that stop, then that's what I was gonna do. Unfortunately, it hasn't stopped and no one else seems to care."

¶ 24    When asked for the addresses of apartments defendant had resided with Guyton, defendant had difficulty remembering them. Towards the end of the interview, defendant claimed that her son was unable to sleep in his own bed because Guyton was forcing him to sleep with him. She claimed Guyton would sexually abuse N.G. "all night long." "This guy sleeps inside my son," she claimed. Biddle asked if N.G. had told her about this alleged abuse. Defendant did not claim that

N.G. had told her about it. When pressed on how she knew about N.G. being "raped all night long," defendant changed the subject.

¶ 25                                    2. Guyton Interview

¶ 26    Police interviewed Guyton on May 28, 2020. On the morning of the incident, Guyton was upstairs playing video games with his son. The door was closed, but he thought he might have heard his mother call out to him over the noise of the window air conditioning unit. Soon, Guyton heard Phillips calling to him from upstairs, which was unusual because her knees made it difficult for her to climb stairs.

¶ 27    When Guyton opened the door, he saw his mother first. She was yelling in Spanish, "She's in the house." Guyton said that he then saw defendant coming up the stairs with a baseball bat in her left hand. He saw the gun in her right hand as she reached the top of the stairs. The gun was down by her side when he first saw it, but then defendant raised it and pointed it at him. Guyton rushed defendant, head down. He explained to officers that he used one hand to try to force the gun down and put the other arm around defendant's neck. He felt several "taps" on the top of his head, and he fell to the ground, on top of defendant.

¶ 28    Guyton told his mother to go and call the police. When N.G. came out of the room, Guyton told him to go downstairs. Guyton reported that defendant was telling N.G. that she was there to "rescue" him and that he must tell the police about the abuse he had allegedly been experiencing.

¶ 29    Alone with defendant upstairs, Guyton said that he was having difficulty seeing because of the blood in his eyes. He was beginning to feel faint from blood loss and said he was very worried that he would pass out and defendant would be able to recover the gun he had knocked away from her. He choked defendant into unconsciousness and then called out for help. He was able to speak to police when they arrived and was taken to the hospital.

¶ 30    Guyton also spoke of escalating threats from defendant over preceding months. He mentioned the circumstances of their divorce and defendant's threats to Guyton going back several years. In recent months, defendant had prompted the police to conduct wellness checks on N.G. on a regular basis. Defendant had sent repeated text messages and e-mails to Guyton, including one that said that he "better hope they find you before I do." Guyton was "not surprised" that defendant drove from California because she seemed to believe she was "on a mission from God to rescue her son." Guyton adamantly denied defendant's accusations.

¶ 31                              3. Phillips Interview

¶ 32    Officers also interviewed Phillips, Guyton's mother and N.G.'s grandmother. Her account of the incident was consistent with Guyton's account. She saw defendant on her property and demanded that she leave. She saw defendant cutting the screen to enter the house. Phillips called out to her son and ran upstairs to warn him. She said that defendant was carrying a baseball bat and a handgun as she came up the stairs. Defendant hit Phillips on the head with the bat and cut/bit her arm during an altercation over the gun. Phillips became partially trapped under defendant and Guyton during the struggle but was able to take N.G. to safety and call the police. When the police arrived, Phillips let them know that her mother was still in the house. Phillip's mother was uninjured.

¶ 33                              B. Defendant's Videos

¶ 34                              1. May 24 Video

¶ 35    Defendant recorded two videos on a cellphone that showed her preparation and execution of her planned recovery of her son, N.G. The first video lasted approximately an hour and shows a point-of-view recording of defendant exploring the area around the house on May 24, 2020. The video shows defendant approaching Guyton's house. She walks around the area, including

climbing over chain-link fences and crouching by a tree for almost 20 minutes. Defendant occasionally speaks to the camera, including reading off license plate numbers of vehicles parked on the property. The video ends with defendant saying "Ok, I'm leaving" and entering her car.

¶ 36                                                    2. May 25 Video

¶ 37    As she had done the day before, defendant taped a cell phone to her baseball cap to record her entrance into the home. As she explained during her interview, she believed she would catch Guyton sexually assaulting their son and the video would aid the police.

¶ 38    The video of the incident is two hours long. No faces are visible during the video. The video itself goes dark after approximately 12 minutes, but the audio continues for the full duration of the recording. Defendant can be heard cutting through the screen door to gain access, as Phillips yells for her to leave the property. Defendant striking Phillips is audible moments before Guyton calls out "Hey, hey watch out!" As they struggle, blood splatter is visible on the wall. The video is lost shortly after they fall to the ground.

¶ 39    Guyton asked for a towel because he could not see from the blood running into his eyes. Guyton can be heard telling Phillips to go downstairs and call the police. When N.G. comes out of the upstairs room, both Guyton and defendant ask him to call the police. Defendant then makes the following plea to her son:

"When the police get here I need you to tell them the truth what he's doing to you. It's just gonna get worse. If you don't, I'm gonna go to jail and he'll keep doing it. Do you understand me? [N.G.], when the police come I need you to tell them he's been raping you. Make sure you tell them he's been raping you. Ok? You understand? [N.G.]! I need you to do that or it will just get worse. I see what he does to you all night long. I'm here to save you. This is your last chance. You understand me? When the police get here, you have to

tell 'em, they'll take him away, alright? You have to do it today, [N.G.]. It's your last chance. Do you understand? If you don't, I'm going to jail for nothing. And he's gonna keep doing it. I need you to tell the truth, don't be afraid. This is your last chance, baby. OK? I'm here for you. I can't fight for you anymore. *** He'll just kill you. It's getting worse and worse just like I told you it would. Tell them about the drugs he's putting you on. Do you understand? Do you understand? Tell them about the drugs. When the police come, please baby. You're the last chance we got. Do you understand?"

¶ 40    Both defendant and Guyton stopped speaking when Phillips and N.G. left to call police. After a few minutes, Guyton's breathing can be heard becoming labored. The recording captures the sounds of him choking defendant into unconsciousness and then calling out for help. The audio recording includes the arrival of the police and the paramedics and even the sounds of the police photographer taking images of the scene.

¶ 41                    C. Pretrial Fitness and Sanity Evaluations

¶ 42    The parties appeared before the trial court on June 11, 2020. Defense counsel indicated he would be requesting evaluations for both fitness and insanity. The trial court mentioned the Kane County Diagnostic Center as a resource, but that it was unclear if they would be conducting evaluations during the pandemic-related shutdown.

¶ 43    Dr. Elisa Lancaster, a staff psychologist at the Kane County Diagnostic Center, conducted a fitness evaluation of defendant on September 10, 2020. Lancaster described defendant as initially "on topic" regarding her history but becoming "illogical in her thinking" as she began to describe how other people were communicating with her telepathically. Lancaster noted defendant

> "reported that she does experience auditory hallucinations throughout the day and indicated
> that the 'voices' had not 'started yet.' She went on to state that she hears her son 'all night

long and in the morning,' but does not hear him during the day because he is in school. [Defendant] reported that her son is being sexually assaulted and that he screams for her at night. She also endorsed experiencing visual hallucinations of 'angels, visions,' and sometimes 'hears people's thoughts.' [Defendant] stated that she hears these voices 'whenever it is needed at the moment.' "

¶ 44 Lancaster diagnosed defendant with "Schizoaffective Disorder, Bipolar Type, Multiple Episodes, Currently in Acute Episode" and deemed her unfit to stand trial due to fixed delusional beliefs and illogical thinking. The trial court found defendant unfit at a hearing on October 29, 2020. Defendant was eventually admitted to the Elgin Mental Health Center on January 8, 2021.

¶ 45 A progress report, dated February 23, 2021, indicated that defendant's medications had been adjusted and her condition had improved, but she still needed improvement regarding delusions and decision making. In a 90-day progress report dated March 30, 2021, defendant's treatment team at Elgin Mental Health Center opined that she was fit to stand trial. The trial court accepted the stipulated position of defendant's fitness, and the criminal case was scheduled to proceed.

¶ 46 Defendant then asserted the affirmative defense of not guilty by reason of insanity. The court ordered the Kane County Diagnostic Center to evaluate defendant for the insanity defense. On October 5, 2021, Dr. Lancaster performed the evaluation, interviewing defendant and reviewing various records along with the prior evaluation and reports submitted by defense counsel. In her report, dated January 13, 2022, Lancaster specifically noted defendant's auditory hallucinations, including hearing her son scream through their telepathic connection. Defendant would reportedly try to aid N.G. in fighting off Guyton by inflicting pain on herself or stomping

on the ground to project pain to Guyton's testicles. Lancaster concluded that, at the time of the incident, defendant

> "continued to experience auditory hallucinations in the form of her son calling for help during that time and experienced what she described as feeling as if she was 'drugged' telepathically. [Defendant] was not in touch with reality and her thinking was disorganized and illogical. She was also not on any psychotropic medications at the time and her psychotic symptoms were significantly impacting her functioning. *** Upon reaching the victim's residence, [defendant] reported that she was focused on 'saving' her son and entered the home with the intention of retrieving him. Records indicated that she had taken steps to ensure she knew the best route to the hospital and that she had surveyed the home and the entrances so that she could enter and exit quickly. This aligns with her mental state at the time which was focused on her delusional beliefs surrounding the safety of her son and his well-being. Her behaviors were bizarre, she was experiencing active delusions and hallucinations, and an elevated mood. [Defendant's] thinking was impaired and she was not able to appreciate the immediate or long-term consequences of her actions. During this evaluation, [defendant] was more aware of her behaviors and indicated that she did not enter the home with the intention to harm anyone. However, at the time of the alleged index offense, she was not able to weigh alternative behaviors, did not assess the risk of her actions, and was not able to make informed decisions due to the nature of her presenting symptomatology."

¶ 47    Lancaster concluded that, to a reasonable degree of psychological certainty, defendant was legally insane at the time of the alleged offense and was not able to appreciate the criminality of her conduct at that time.

¶ 48 Defendant signed a jury waiver on June 24, 2022.

¶ 49                                   D. Bench Trial

¶ 50 The case then proceeded to a partially-stipulated bench trial on January 3, 2023. The parties entered into five stipulations, including (1) that the State would be able to lay the proper foundation for the admission of 50 pieces of evidence, including the cell phone video of the occurrence, the video of defendant's statement to the police, and the videotaped statements of Guyton and Phillips; (2) that Guyton's and Phillips's testimonies would be consistent with their videotaped statements, with specific additions; (3) that Lancaster would be qualified as an expert in forensic psychology, that her January 13, 2022 sanity evaluation was admissible evidence, and that Lancaster would testify consistently with the contents of that evaluation with the addition of further direct examination by defendant and cross-examination by the State; and (4) that various law enforcement personnel would testify. As the State explained to the court, "Counsel and I have spoken, and we would be agreeable to presenting the State's case-in-chief almost entirely—well, entirely by [s]tipulation. That is not the subject matter that's at debate in this trial, so-to-speak." Defense counsel stated, "We'd stipulate to their case, they'll stipulate to our [d]efense but they want to have an opportunity to cross-examine our expert regarding the issue of *** the rest of the issues in the case." Counsel further explained that "the contested issues that we see in the matter are related to [defendant's] [d]efense" and were

> "not related to the State's case-in-chief, so *** we don't want to waste the [ ] Court's time.
> We don't want to have—you know, just be presenting evidence for the sake of evidence,
> contesting issues that really aren't contested; I mean, I understand her rights, but this is—
> I believe that the case starts pretty much at the defense."

Defendant agreed.

¶ 51　　The parties presented three additional stipulations at the start of the bench trial on February 3, 2023. The parties agreed that Kane County Sherrif's Deputy Brian Demeter would testify to being called to Guyton's house on May 25 and would describe his role in securing the scene. The parties further stipulated that defendant's Firearm Owners Identification (FOID) card had been revoked since June 29, 2017, that there was no record she had a concealed carry license, and that the handgun recovered at the scene was loaded and capable of being fired.

¶ 52　　　　　　　　　　　　　　　　1. Live Testimony

¶ 53　　The State called Steve Bruening, the head of the Kane County Sheriff's Evidence Division, as its only witness. Bruening was qualified as an expert in digital forensics and the extraction of data from cell phones. In the immediate matter, Bruening testified he received two cell phones and was able to extract data from one of them. He laid the foundation for text messages allegedly between defendant and other parties, but those messages were not admitted into evidence.

¶ 54　　Defendant called Dr. Lancaster as the only defense witness. Lancaster's qualifications as an expert had been stipulated by the parties, and the sanity evaluation she prepared on defendant was entered into evidence. On direct examination, Lancaster testified that she diagnosed defendant with schizoaffective disorder, bipolar type. In reaching this diagnosis, Lancaster testified she had reviewed materials relating to defendant's mental health history, including a document provided by defendant's family regarding her behavior during the past two decades.

¶ 55　　On cross-examination, Lancaster agreed it was possible for someone to be mentally ill but still appreciate that his or her behavior was wrong. She testified she had interviewed defendant for one to two hours for the evaluation. She had also consulted police reports, mental health records from the jail, and health records from Rush-Copley Medical Center. While she had reviewed the

seven-page document from defendant's family, she had not personally contacted family members to provide context or additional information.

¶ 56    The State next turned to Lancaster's statement within her report that defendant "presented with active psychosis at the time of her detainment in May 2020, and she was reportedly observed responding to internal stimuli, including command hallucinations." Lancaster explained that command hallucinations are auditory hallucinations that direct someone to do something or act in a certain way. When asked for a specific reference from the record, Lancaster pointed to a mental health progress note from June 7, 2020, in which defendant was reportedly stomping her right foot to "stop the demons." Lancaster agreed that this was not specifically a command hallucination but was indicative of auditory and visual hallucinations. Although she was given time to find it within the records she used for the report, Lancaster was unable to find any examples of command hallucinations reported.

¶ 57    Lancaster testified that she was aware of a cell phone extraction being performed on defendant's phone but did not review extracted information. The State then asked if Lancaster was aware that defendant had been stopped twice by police during her drive from California to Aurora. Lancaster testified that she did not remember that being in the record she reviewed. Asked whether defendant's conduct on May 24 and May 25, 2020, showed planning, Lancaster replied that she "could [not] speak to [defendant's] thought process" and "[could not] say whether or not she planned that." She also testified that she had not watched the recordings of defendant's interview with the police on the day of the incident. She did not have the videos at the time of the evaluation and did not ask for them to be provided to her. Lancaster testified that she felt confident in her opinion and felt that the record was sufficient to support it.

¶ 58    The State called Deputy Biddle as a rebuttal witness. Biddle testified that he responded to the dispatch on the day of the incident and first met defendant in the emergency room. He testified that defendant was coherent and appeared to understand the *Miranda* warnings. Defendant did not appear to be "talking or responding to internal stimuli or imaginary people or invisible people or things."

¶ 59    Biddle testified that he drove defendant to the Kane County Sheriff's Office upon her release from the hospital. The video-recorded interview was conducted there with a detective present. Biddle testified that defendant responded appropriately to questions and her thoughts seemed organized. She stated her belief that Guyton was abusing N.G. and she was hoping to take N.G. to the hospital to find evidence of the purported abuse. Biddle testified that defendant appeared to understand the difference between right and wrong; indeed, defendant stated that the risk of the potential consequences was worth the reward of protecting N.G. On cross-examination, Biddle testified that defendant did not attempt to evade questions. He agreed that he did not have any formal education in the field of psychology or psychiatry.

¶ 60    After the entry of the stipulations and the limited live testimony, the trial court found that the State proved defendant guilty beyond a reasonable doubt of all 19 charges and that defendant failed to prove by clear and convincing evidence that she was not guilty by reason of insanity. When asked to clarify whether it found defendant guilty or guilty but mentally ill, the court stated, "I don't think the [d]efendant ever asked for that finding, but if they're asking for it now, I would find her guilty but mentally ill."

¶ 61                                   2. Written Findings and Ruling

¶ 62    In its subsequent written findings and ruling, the trial court agreed with Lancaster that defendant suffered from the mental illness of schizoaffective disorder, bipolar type, but disagreed

that defendant was insane on May 25, 2020. In discounting Lancaster's expert opinion, the court noted that Lancaster

> "never watched the video tape of the defendant from the day before the date of occurrence. Nor did she watch the video and audio tape from the defendant's phone during the occurrence. Nor did she watch the audio-video recording of the defendant's interview/statement taken after she was arrested and in custody of the Kane County Sheriff's Department."

Finding that defendant "planned this event very carefully and thoughtfully," the court did not find credible Lancaster's testimony that "she could not speak to the defendant's thought process or whether or not [defendant] planned" the events of May 25.

¶ 63   Furthermore, the trial court found that

> "the defendant knew what she was doing was wrong, that she took measures to hide herself before the crime, that she had a plan on what she wanted to do, that she was able to control her actions, and that she tried to minimize her culpability by saying she was armed with weapons to defend herself."

Concluding that defendant failed to prove by clear and convincing evidence that she lacked substantial capacity to appreciate the criminality of her conduct on May 25, 2020, the court found defendant guilty but mentally ill on all 19 counts.

¶ 64   A sentencing hearing was held on October 20, 2023. Two of defendant's family members testified in mitigation. On November 1, 2023, the trial court sentenced defendant to concurrent terms of 21 years in prison for home invasion (counts I through V merged into count VI), 15 years for armed violence (count VII), 4 years for attempted aggravated kidnapping (counts VIII and IX merged into count X), 4 years for aggravated domestic battery (counts XII and XIII merged into

count XI), 5 years for aggravated battery (counts XIV, XVI, and XVII merged into count XV), and 3 years for aggravated unlawful use of a weapon (count XIX merged into count XVIII).

¶ 65    Defendant timely appealed.

¶ 66                                    II. ANALYSIS

¶ 67    On appeal, defendant asserts that (1) the trial court's finding her guilty but mentally ill was against the manifest weight of the evidence; (2) she was denied her right to effective assistance of counsel; (3) her convictions of attempted aggravated kidnapping should be reversed because she cannot, as a parent, be convicted of the crime; and (4) her conviction of aggravated domestic battery and armed violence violates the one-act, one-crime doctrine. We will address each argument in turn.

¶ 68                              A. Guilty but Mentally Ill

¶ 69    Defendant first contends that the trial court erred in finding her guilty of the charges but mentally ill. A person is not criminally responsible for conduct if, at the time of the conduct, she suffered from a mental disease or defect such that she lacked the substantial capacity to appreciate the criminality of her conduct. *People v. Plackowska*, 2020 IL App (2d) 171015, ¶ 47. "When a defendant raises the affirmative defense of insanity, she bears the burden of proving by clear and convincing evidence that she is not guilty by reason of insanity, while the State retains the burden of proving the defendant guilty beyond a reasonable doubt." *Id.* (citing 720 ILCS 5/6-2(e) (West 2012)).

¶ 70    Determining whether a defendant was sane at the time of an offense is generally a question for the trier of fact. *People v. McDonald*, 329 Ill. App. 3d 938, 946 (2002). We will not disturb the trier of fact's resolution on the issue of an insanity defense unless it is against the manifest weight of the evidence. *People v. Frank-McCarron*, 403 Ill. App. 3d 383, 396 (2010). A finding is against

the manifest weight of the evidence only where the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). "We will not substitute our judgment for the trial court's regarding the weight of the evidence, the credibility of the witnesses, or the inferences to be drawn from the evidence." *People v. McCullum*, 386 Ill. App. 3d 495, 505 (2008). "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995).

¶ 71   As the defendant bears the burden of proving insanity, "the State does not need to present expert testimony on the issue of sanity but may rely purely on facts in evidence and the inferences that follow from those facts." *People v. Romero*, 2018 IL App (1st) 143132, ¶ 63.

> " '[W]hile it is within the province of the [trier of fact] as the judge of the witness' credibility to reject or give little weight to *** expert psychiatric testimony, this power is not an unbridled one' ([*People v.*] *Baker*, 253 Ill. App. 3d [15,] 30[ (1993)]), and a trial court may not simply draw different conclusions from the testimony of an otherwise credible and unimpeached expert witness [citation]." *People v. Kando*, 397 Ill. App. 3d 165, 196 (2009)).

> "The trier of fact may entirely reject expert testimony if it concludes that the defendant was sane based on factors such as lay testimony based on observations made shortly before or after the crime, the existence of a plan for the crime, and methods undertaken by defendant to prevent detection." *Romero*, 2018 IL App (1st) 143132, ¶ 63.

"Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *McCullum*, 386 Ill. App. 3d at 504.

¶ 72    We cannot say the trial court's finding that defendant was guilty but mentally ill was against the manifest weight of the evidence. The trial court was presented with largely uncontroverted and stipulated testimony of witnesses, police officers, and victims, as well as the expert testimony of Dr. Lancaster on defendant's mental state during the offense. The court could consider this lay testimony in conjunction with the expert testimony in ruling on defendant's insanity defense. The trial court's decision was based on evidence that defendant had created a detailed plan to drive thousands of miles from California to Illinois, to calculate the best route from the property to a nearby hospital, to hide her vehicle and sneak onto the property, and to arm herself with a variety of weapons. The court's ruling reflects that, in finding her guilty but mentally ill and not insane, the court considered the fact that defendant appeared to appreciate the criminality of her conduct.

¶ 73    Defendant notes that the trial court rejected the determination of Lancaster, the only expert who evaluated defendant, that defendant was legally insane at the time of the offense. The trier of fact assesses witness credibility, including the testimony of expert witnesses. *Romero*, 2018 IL App (1st) 143132, ¶ 63. Here, the trial court discounted the testimony of Lancaster. The trial court discounted this testimony specifically because Lancaster had not watched the hour-long video from the day before the incident, the two-hour video from the day of the incident, and the video of defendant's interview with police officers when she was in the custody of the Kane County Sheriff's Department. The court, as the trier of fact viewing all of the evidence, found that defendant "knew what she was doing was wrong, that she took measures to hide herself before the crime, that she had a plan on what she wanted to do, that she was armed with weapons to defen[d] herself." After reviewing the evidence, including the videos, we cannot conclude that the trial court erred in discounting the testimony of Lancaster.

¶ 74    Defendant also asserts that the trial court erred in relying on evidence that defendant was stopped twice by police officers during her drive from California, because the evidence was not "in the record." The State had asked Lancaster during cross-examination if she was "also aware that the defendant had been stopped twice by police officers during her trip from California to Aurora?" Lancaster did not recall the information but agreed that it could show that defendant was able to "conform her behavior to societal norms." The trial court referenced this evidence in its written ruling: "[Defendant] was stopped by the police twice en route. She was able to interact with the police and she conformed to societal norms during those police encounters."

¶ 75    Defendant notes that a judge in a bench trial is presumed to disregard improper evidence (*People v. Adams*, 2023 IL App (2d) 220061, ¶ 108), but she asserts that the trial court in fact referenced the improper evidence and defense counsel's failure to object rendered counsel's assistance ineffective. The State counters that the appellate record does not contain the entirety of discovery tendered and defendant cannot claim that the State did not have a good-faith basis to ask the questions by merely pointing to an incomplete appellate record. Regardless, we find that the trial court's reliance on this evidence to be, at most, harmless. There was no reasonable possibility that defendant would have been acquitted in the absence of this evidence. See *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 138.

¶ 76                              B. Ineffective Assistance of Counsel

¶ 77    Defendant next contends that she was denied effective assistance of counsel. Specifically, defendant avers her trial counsel was ineffective for (1) failing to file a motion to suppress her post-arrest statements to the police, (2) failing to properly investigate and present her affirmative defense of insanity, and (3) failing to provide even a basic level of representation that would have subjected the State's case to meaningful adversarial testing.

¶ 78　The right to counsel is, in effect, the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 (1970); *People v. Rogers*, 2021 IL 126163, ¶ 23. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant claiming ineffective assistance of counsel must show not only that her counsel's performance was deficient, but that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Under the two-prong test for determining whether counsel's assistance has been ineffective, a defendant must show that (1) her counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 144. In demonstrating deficient performance under the first prong, a defendant must overcome a strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy. *Id.* Under the prejudice prong, a reasonable probability that the result would have been different is a sufficient probability to undermine confidence in the outcome. *Id.* To prevail on a claim of ineffective assistance, a defendant must satisfy both the performance and the prejudice prongs of the test. *Id.* at 144-45.

¶ 79　　　　　　　　　　1. Suppression of Confession

¶ 80　Defendant first argues that counsel was ineffective for failing to file a motion to suppress her recorded interview. According to defendant, the totality of the circumstances demonstrated that defendant was not cognizant of the State's intention to use her statements to secure a conviction. Despite defendant's "obviously disturbed mental state," counsel failed to contest her ability to knowingly, intelligently, and voluntarily waive her rights under *Miranda* , 384 U.S. 436.

¶ 81 The State argues that defendant is foreclosed from presenting a claim for ineffective assistance on this basis because she and counsel stipulated to the admission of the evidence of her statements to the police. However, this argument has no merit in this case.

¶ 82 "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). A defendant may not argue on appeal that the trial court erred by admitting the very evidence that she stipulated to at trial. *People v. Holliday*, 2020 IL App (5th) 160547, ¶ 48. To allow a defendant to procure, invite, or acquiesce in a ruling by the trial court, even if it is improper, and then contest that same ruling on appeal, would offend the notion of fair play and encourage duplicity by litigants. See *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 99. A reviewing court will generally refuse to consider a claim of trial court error as a result of motions brought by defense counsel or rulings issued at a defendant's request. However, invited error does not preclude a defendant from raising a claim of counsel's neglect on the same issue; the doctrine of invited error may block a defendant from raising an issue on appeal, *absent ineffective assistance of counsel*. *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 210 (appellate court dismissed claim that defendant was denied a fair trial by being tried jointly with codefendant as invited error but addressed defendant's claim that counsel was ineffective for failing to object); see *Holliday*, 2020 IL App (5th) 160547, ¶¶ 45-51 (finding invited error applied where defense counsel stipulated to the admission of photographs yet addressing the defendant's argument that counsel was ineffective for stipulating to the admission). Defendant's claim here is not that the trial erred in admitting the evidence of her statement, but that defense counsel was ineffective for failing to attempt to suppress the evidence. Thus, the fact that counsel stipulated to the admission of the evidence of

defendant's statements to the police does not prevent this court from addressing defendant's claim of ineffectiveness for failing to file a motion to suppress her recorded interview.

¶ 83    Ordinarily, matters of trial strategy will not support an ineffective-assistance-of-counsel claim. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005). Counsel's decision whether to pursue a motion to suppress is generally considered a matter of trial strategy and is entitled to great deference. *People v. Utley*, 2019 IL App (1st) 152112, ¶ 55. "When reviewing a ruling on a motion to suppress, overcoming the prejudice prong requires the defendant to show a reasonable probability both that: (1) the suppression motion would have been granted; and (2) the trial outcome would have been different if the evidence had been suppressed." (Emphases omitted.) *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 84    In discussing the planned stipulations with the trial court, defense counsel explained that the contested issues were related to defendant's insanity defense and were "not related to the State's case-in-chief, so *** we don't want to waste the [ ] Court's time." Counsel did not want to "just be presenting evidence for the sake of evidence, contesting issues that really aren't contested." Counsel stated "that the case starts pretty much at the defense." It is clear from the record that trial counsel relied upon the admission of the video evidence to support defendant's affirmative defense of insanity. Defendant's answers to questions and mannerisms during the interview were relevant to this affirmative defense. On appeal, defendant takes the inconsistent position that her "disquieting" appearance in the video both supports her claim of insanity *and* her position that her trial counsel should have moved to suppress it. Given the nature of the other videos that defendant herself recorded, trial counsel's representation was not deficient for failing to move to suppress post-arrest statements. All of counsel's decisions related to video submissions can be attributed to trial strategy.

¶ 85                                    2. Insanity Defense

¶ 86    Defendant next argues that counsel was ineffective because he failed to adequately investigate and present a defense of insanity. Even if a trial strategy did not result in an outcome favorable to defendant, we "must make every effort to eliminate 'the distorting effects of hindsight.' " *People v. Peterson*, 2017 IL 120331, ¶ 88 (quoting *Strickland*, 466 U.S. at 689). "There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ***." *People v. Miller*, 346 Ill. App. 3d 972, 982 (2004) (citing *People v. Smith*, 195 Ill. 2d 179, 188 (2000)).

¶ 87    Defendant notes that the State's cross-examination of Lancaster was lengthier than the direct or redirect of trial counsel. This is accurate, but there is no magic number of questions required of an effective counsel. The parties stipulated to Lancaster's qualifications as an expert and the foundation of her written report of her sanity evaluation of defendant, thus reducing the need for a lengthy direct examination. On redirect, trial counsel addressed numerous issues that had been raised during cross-examination, including asking Lancaster to testify to examples of defendant's delusional beliefs and to clarify that she would rely on records provided to her to make her evaluations, asking for additional information only if it was relevant to the case. Each of these actions can be attributed to reasonable trial strategy. Defendant has failed to show that counsel's performance was so deficient as to fall below an objective standard of reasonableness, and defendant's claim thus fails. *Strickland*, 466 U.S. at 688.

¶ 88    Trial counsel was also not ineffective for failing to provide Lancaster with the many videos from this case. As noted, Lancaster specifically testified that she was able to render her opinion, in favor of defendant, without video evidence. Her habit was to rely upon the written records provided to her. She relied on the written police reports and testified that she would have reached

out to defense counsel for the videos if she needed them. While it is true that the trier of fact discounted Lancaster's expert opinion because she did not watch the videos, we do not review the efficacy of trial strategy with the benefit of hindsight. *Peterson*, 2017 IL 120331, ¶ 88.

¶ 89                                   3. Meaningful Adversarial Testing

¶ 90    Defendant contends that defense counsel provided ineffective assistance in failing to subject the State's case against her to any meaningful adversarial testing. Ordinarily, in determining whether a defendant was denied the effective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficiency prejudiced the defendant. *People v. Cherry*, 2016 IL 118728, ¶ 24 (citing *Strickland*, 466 U.S. at 687). However, this two-part test need not be applied, and prejudice will be presumed, where (1) the defendant is denied counsel at a critical stage of the proceedings, (2) counsel entirely fails to subject the State's case to meaningful adversarial testing, or (3) counsel is called upon to represent a client in circumstances under which no lawyer could provide effective assistance. *Id.* ¶ 25 (citing *United States v. Cronic*, 466 U.S. 648, 659-61 (1984)).

¶ 91    "The United States Supreme Court has characterized the second *Cronic* exception, failing to subject the State's case to meaningful adversarial testing, as narrow and infrequently applied." *People v. Boots*, 2022 IL App (2d) 200640, ¶ 26 (citing *Cherry*, 2016 IL 118728, ¶ 26, citing *Florida v. Nixon*, 543 U.S. 175, 190 (2004)). For the exception to apply, it is not enough that counsel failed to oppose the prosecution at specific points in the proceeding. *Bell v. Cone*, 535 U.S. 685, 697 (2002). Rather, counsel's failure must be so complete that he or she failed to oppose the prosecution throughout the proceeding as a whole. *Cherry*, 2016 IL 118728, ¶ 26. As a result, courts have rarely applied the second *Cronic* exception, explaining that only *nonrepresentation*, not poor representation, triggers the presumption of prejudice under *Cronic*. *Id.* (citing *Miller v.*

*Martin*, 481 F.3d 468, 473 (7th Cir. 2007)). The application of the second *Cronic* exception is so rare that, in the 30 years since *Cronic* was decided, our supreme court has found *per se* ineffectiveness under this exception in only two cases. *Id.* ¶ 27.

¶ 92 The State argues that the circumstances of this case do not rise to the level of nonrepresentation. Indeed, the record shows that defendant's trial counsel was actively representing her during the entire trial. Counsel requested a fitness examination and then called on an expert to support the affirmative defense of insanity; he redirect-examined this expert witness and cross-examined the State's witness. Counsel objected to evidence adverse to defendant and made a closing argument that asserted that defendant should be found not guilty by reason of insanity. And when the trial court found defendant guilty but mentally ill, counsel moved for a new trial. Defendant has failed to demonstrate that the second *Cronic* exception is applicable here, and thus we find that she was not denied the effective assistance of counsel.

¶ 93 C. Attempted Aggravated Kidnapping

¶ 94 Defendant next contends that, as a matter of plain error, her convictions of attempted aggravated kidnapping must be reversed because a parent cannot be convicted of kidnapping her own child. Biological parenthood is a defense to aggravated kidnapping. See *People v. Algarin*, 200 Ill. App. 3d 740, 749-50 (1990); see also *People v. Sepeda*, 2020 IL App (2d) 180842-U, ¶ 30.

¶ 95 The State agrees that, as the biological mother of N.G., defendant cannot be convicted of this offense, and the convictions should be vacated. However, the State counters that defendant's convictions should be reduced to the lesser-included offenses of attempted unlawful restraint (720 ILCS 5/8-4(a), 10-3(a) (West 2018)) on count VIII and attempted aggravated unlawful restraint (*id.* §§ 8-4(a), 10-3.1(a)) on counts IX and X. Notably, biological parenthood is not a defense to unlawful restraint. *Algarin*, 200 Ill. App. 3d at 751.

¶ 96    Criminal defendants have a fundamental right to due process of law, which includes notice of the charges brought against them. *People v. Robinson*, 232 Ill. 2d 98, 104 (2008). As a result, a defendant may not be convicted of an offense that she has not been charged with committing. *People v. Zarbock*, 2022 IL App (2d) 210238, ¶ 41. "However, a defendant may be convicted of an uncharged offense if it is a lesser included offense of an offense expressly charged in the charging instrument and the evidence adduced at trial rationally supports a conviction of the lesser included offense and acquittal of the greater offense." *Id.* (citing *People v. Kolton*, 219 Ill. 2d 353, 360 (2006)).

¶ 97    A reviewing court may reduce the degree of an offense of which the appellant was convicted. Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967). A court may exercise this authority when the evidence fails to prove beyond a reasonable doubt an element of the greater offense. *People v. Kennebrew*, 2013 IL 113998, ¶ 21. " '[S]tate and federal appellate courts have long exercised the power to reverse a conviction while at the same time ordering the entry of a judgment on a lesser-included offense.' " *Id.* (quoting *People v. Knaff*, 196 Ill. 2d 460, 477-78 (2001)). The authority to order the entry of judgment on the lesser-included offense is both statutory and based on the common law, and the constitutionality of the practice has never been seriously questioned. *Id.*

¶ 98    Courts have employed three methods to determine whether an offense is a lesser included offense: (1) the "abstract elements" approach, (2) the "charging instrument" approach, and (3) the "factual" or "evidence" adduced at trial approach. *Id.* ¶ 28. The "charging instrument" approach applies to determine whether an *uncharged* offense is a lesser included offense of a charged offense. *People v. Henson*, 2017 IL App (2d) 150594, ¶ 18. Applying this approach, we look to the charging instrument to see if the description of the greater offense contains a "broad foundation" for the lesser offense. *People v. Miller*, 238 Ill. 2d 161, 166 (2010). The charging-

instrument approach is a two-tiered approach. *Kennebrew*, 2013 IL 133998, ¶ 30. First, the court must determine whether the uncharged offense is a lesser included offense of the greater charged offense. *Id.* Whether an offense is a lesser included offense presents a question of law, which we review *de novo*. *People v. Clark*, 2016 IL 118845, ¶ 32. Second, the court examines the evidence adduced at trial to determine whether the evidence was sufficient to convict defendant of the lesser included offense. *Kennebrew*, 2013 IL 113998, ¶ 30.

¶ 99    Therefore, we turn first to the issue whether aggravated unlawful restraint is a lesser included offense of aggravated kidnapping. A criminal defendant commits the crime of "unlawful restraint" when "he or she knowingly without legal authority detains another." 720 ILCS 5/10-3(a) (West 2018). Aggravated unlawful restraint occurs when a person commits unlawful restraint "while using a deadly weapon." *Id.* § 10-3.1(a). Kidnapping, on the other hand, is when a person "knowingly *** and secretly confines another against his or her will." *Id.* § 10-1(a). Aggravating factors include, among others, committing the crime while armed or taking a child under the age of 13. *Id.* § 10-2(a)(2), (5), (6). "It has been held that there appears to be no basis upon which to distinguish between the word 'detain' in the unlawful restraint statute and the word 'confine' in the kidnapping statute." *People v. Kittle*, 140 Ill. App. 3d 951, 956 (1986). In *Kittle*, we noted that "[t]he Committee Comments to section 10-3(a) [of the Code] treat the offense of unlawful restraint as being synonymous with confinement or detention without lawful authority." *Id.* (citing Ill. Ann. Stat., ch. 38, ¶ 10-3, Committee Comments-1961, at 586-87 (Smith-Hurd 1979)). We held that the evidence in that case established that the victim was in the defendant's continuous control, and both the confinement and the detainment were derived from that control. *Id.* at 956-57. We find, as we have in the past, that unlawful restraint is a lesser included offense of kidnapping. *Id.* at 957.

¶ 100   Our next question is whether there was sufficient evidence to convict defendant of the lesser included offenses. In count IX of the indictment, defendant was charged with committing attempted aggravated kidnapping because she

> "performed a substantial step toward the commission of that offense, in that she took steps to plan the abduction of N.G., such as reconnaissance, practice runs and possessed items to aid her in the abduction, prior to her entering the dwelling of a minor with the initials N.G. with the intent to secretly confine him against his will and was armed with a dangerous weapon, other than a firearm, to wit, a box cutter."

Defendant was charged with attempting to unlawfully confine N.G. while armed with a box cutter. There was considerable evidence that defendant planned to restrain N.G. against his will. She had practiced the route to the house. She entered it with multiple weapons and duct tape. She confessed to police officers that she intended to forcibly, if necessary, take N.G. from his home. In other words, defendant had knowingly and without legal authority taken substantial steps toward detaining N.G. with a deadly weapon. Unlawful restraint is a lesser-included offense of kidnapping (*Kittle*, 140 Ill. App. 3d at 957), and, based upon the "charging instrument" approach, we hold that defendant committed attempted aggravated unlawful restraint.

¶ 101   In her reply brief, defendant asserts that "she cannot be convicted of the lesser offenses here since she cannot be convicted of the greater ones." This bold argument is made without citation to authority and rests precariously on the shakiest of logical foundations. The argument is that she merely intended to "to take N.G. to the hospital" where he would be surrounded by medical professionals who could examine him for signs of abuse. Her motives aside, defendant clearly had the intent to *take* N.G. from his home. She attempted to take N.G. against his will and without legal authority.

¶ 102    Therefore, defendant's convictions of attempted aggravated kidnapping should be vacated and reduced to the lesser-included offenses of attempted unlawful restraint (count VIII) and attempted aggravated unlawful restraint (counts IX-X). The case is remanded for resentencing on counts VIII-X.

¶ 103                               D. One-Act, One-Crime Doctrine

¶ 104    Finally, defendant contends that her conviction of aggravated domestic battery must be vacated, pursuant to the one-act, one-crime doctrine, because her conviction of armed violence was based on the same physical act.

¶ 105    The one-act, one-crime doctrine holds that "a defendant may not be convicted of multiple offenses that are based upon precisely the same single physical act." *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). To determine whether there has been a violation of the one-act, one-crime doctrine, we first determine whether defendant has committed a single act or multiple acts. *People v. Coats*, 2018 IL 121926, ¶ 12. If the defendant committed multiple acts, we must then consider whether any of the offenses of which the defendant is convicted are lesser included offenses. *People v. Ryan*, 2024 IL App (2d) 220076, ¶ 41. If any of the convictions are, in fact, lesser included offenses, then multiple convictions are improper. In contrast, if any of the convictions are *not* lesser included offenses, then multiple convictions can be entered.. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). Whether a violation of the one-act, one-crime rule has occurred is a question of law, which we review *de novo*. *Coats*, 2018 IL 121926, ¶ 12.

¶ 106    When seeking multiple convictions based on closely related acts, the State must show its intent to apportion separate acts to separate charges. *People v. Crespo*, 203 Ill. 2d 335, 344-45 (2001) (violation of one-act, one-crime rule where State failed to apportion separate stabs to separate charges); see *People v. Williams*, 2017 IL App (3d) 140841, ¶ 33 (violation of one-act,

one-crime rule where State failed to apportion separate strikes of baseball bat). We examine the charging instrument and the State's arguments at trial for our determination. *Crespo*, 203 Ill. 2d at 343-45.

¶ 107   The definition of an "act" is "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977). Under that definition, a defendant can be guilty of two offenses when an act is part of both offenses or when an act is part of one offense and the only act of the other offense. *Coats*, 2018 IL 121926, ¶ 15. "Under the one-act, one-crime rule, multiple convictions may not be based on the same physical act." *People v. King*, 2017 IL App (1st) 142297, ¶ 22 (citing *King*, 66 Ill. 2d at 566). The acts to be considered in applying the one-act, one-crime rule are the defendant's culpable acts as opposed to noncriminal acts. *People v. DiPace*, 354 Ill. App. 3d 104, 116 (2004).

¶ 108   The instant case is factually analogous to *Crespo*. In that case, the defendant stabbed the victim three times "in rapid succession." *Crespo* 203 Ill. 2d at 338. On appeal, he argued that his aggravated battery conviction should be vacated because the charge stemmed from the same physical act that formed the basis of an armed violence charge. *Id.* at 340. The State argued that the three different stabbings were separate and distinct acts, capable of independently sustaining each criminal conviction. *Id.* The supreme court held that, although each of the stab wounds could support a separate offense, the convictions of both aggravated battery and armed violence violated the one-act, one-crime doctrine because, in the indictment, the State had failed to apportion the offenses among the various stab wounds and, during closing arguments, the prosecutor had portrayed the defendant's conduct as a single attack. *Id.* at 342-44. The supreme court also noted that the State supported both the bodily harm requirement of aggravated battery and the great

bodily harm requirement of armed violence by noting that the defendant stabbed the victim three times. *Id.* at 343.

¶ 109    Here, the indictment alleged in count VII that defendant committed armed violence when she "struck, stabbed and/or slashed" Guyton. Similarly, count XI alleged that defendant committed aggravated domestic battery when she "knowingly caused great bodily harm to Charles Guyton, being lacerations to Charles Guyton, a family or household member of the defendant." Counts XII and XIII mirror the language of count VII and accuse defendant of committing aggravated battery when she "stabbed, struck, and/or slashed" Guyton.

¶ 110    The State argues that it showed its intention to treat each stab wound as a separate act by the use of the phrase "struck, stabbed and/or slashed." The State also notes that the prosecutor introduced a photograph of the multiple wounds during the trial and made several references to multiple lacerations during closing argument. Pointing to these examples, the State argues "the record shows that the State sought to treat defendant's conduct as multiple acts in order for multiple convictions to be sustained."

¶ 111    We disagree. While the State may have referred to Guyton receiving more than one laceration, it did not attempt to apportion these offenses by providing distinct striking locations or resulting injuries. As in *Crespo*, the charging documents treat the various stab wounds as a single occurrence and each charge refers to the same event. See *id.* Additionally, the State did not argue at trial that each count was directed at a different blow or injury location. Therefore, defendant lacked the requisite notice that the State intended to treat her conduct as separate acts, and multiple convictions cannot be sustained. Accordingly, because armed violence is the more serious offense, we reverse the convictions of aggravated domestic battery and aggravated battery on counts XI, XII, and XIII of the indictment and vacate the sentence for aggravated domestic battery. See

*People v. Johnson*, 237 Ill. 2d 81, 97 (2010) ("[I]f a defendant is convicted of two offenses based upon the same single physical act, the conviction for the less serious offense must be vacated.").

¶ 112                                III. CONCLUSION

¶ 113   For these reasons, the judgment of the circuit court of Kane County is affirmed as to the convictions of home invasion (counts I through VI), armed violence (count VII), aggravated battery (counts XIV through XVII), and aggravated unlawful use of a weapon (counts XVIII through IX). The convictions of attempted aggravated kidnapping are modified to the lesser-included offenses of attempted unlawful restraint (count VIII) and attempted aggravated unlawful restraint (counts IX through X) and are remanded for sentencing. The convictions of aggravated domestic battery and aggravated battery (counts XI, XII, and XIII) are reversed and the sentence imposed for aggravated domestic battery is vacated.

¶ 114   Affirmed in part, affirmed as modified in part, and reversed in part.

¶ 115   Cause remanded.

*People v. Lagrone*, **2025 IL App (2d) 230543**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CF-931; the Hon. Alice C. Tracy, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Ann Fick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Clare Wesolik Connolly, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |