2025 IL App (2d) 240268-U
No. 2-24-0268
Order filed December 26, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-CF-240 |
| | ) | |
| STEVEN T. GRIMMITT, | ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1　*Held*: Defendant forfeited his double jeopardy claim where he did not raise an objection at trial nor did he include the issue in a written post-trial motion. Even so, defendant's double jeopardy rights were not violated. The counts he was acquitted on did not constitute the same offenses as the counts he was sentenced on for double jeopardy purposes.

¶ 2　At issue here is whether defendant, Steven T. Grimmitt's constitutional right to be free from double jeopardy was violated where the trial court entered a judgment notwithstanding the verdict, acquitting him of counts 3, 5, 6, 10, 12, 14, and 16, and sentenced him on counts 1, 2, 4,

7, 8, 9, 11, 13, and 15, which contained identical language to the indictments for the counts on which defendant was acquitted. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On March 16, 2021, defendant was charged by indictment with 17 counts of various sex offenses involving two minor victims, A.F. and T.G. Counts 1 through 3 charged defendant with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and alleged that between May 1, 2012, and November 2, 2013, defendant placed his finger in A.F.'s sex organ. Counts 4 through 6 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and November 2, 2013, defendant rubbed A.F.'s sex organ with his hand. Count 7 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and November 2, 2013, defendant rubbed A.F.'s back with his hand. Count 8 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and November 2, 2013, defendant rubbed A.F.'s breast with his hand. Counts 9 through 10 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and April 25, 2014, defendant rubbed T.G.'s buttocks with his hand. Counts 11 through 12 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and April 25, 2014, defendant rubbed T.G.'s leg with his hand. Counts 13 and 14 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and April 25, 2014, defendant touched T.G.'s buttocks with his hand. Counts 15 and 16 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) and alleged that between May 1, 2012, and April 25,

2014, defendant touched T.G.'s sex organ with his hand. Count 17 charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2020)) and alleged that between April 26, 2014, and April 30, 2015, defendant placed his hand on T.G.'s sex organ.

¶ 5      The matter proceeded to trial on April 3, 2024. The State called T.G. as their first witness. She testified as follows. T.G. was born April 26, 2001. At the time of the trial, she was 22 years old. Currently, she lives in Fort Myers, Florida, for work and school. Prior to living there, she lived in Pingree Grove with her parents and two siblings for the majority of her childhood. Defendant is T.G.'s uncle. In April 2012, when T.G. was 11, defendant and his family moved in with T.G.'s family. Defendant and his family lived in the basement of the home for the approximately three years they lived with T.G. and her family.

¶ 6      T.G. and defendant had a very close relationship. She saw him as one of her best friends. In her words: "He was kind of like the cool uncle. He would let me watch movies I wasn't supposed to. We would hang out a lot. He would let me break the rules that my parents would enforce, so I saw him as a cool person to be around." Defendant would also talk about inappropriate things with T.G. For example, he would make a lot of dirty jokes, express his sexual preferences, and detail his past sexual experiences.

¶ 7      Shortly after defendant moved in, a strange incident occurred in T.G.'s bedroom. She awoke to defendant standing over her with the blankets pulled down. She screamed and he tried to calm her down. When he was unable to do so, he ran out of the room and down the stairs.

¶ 8      There were also occasions when T.G. would fall asleep either on the couch or in defendant's bed while they were watching movies together. She would awaken to her "footy pajamas" being unzipped and her body being exposed.

¶ 9    Close in time to when defendant and his family moved out, defendant took T.G. on a trip to the farm of defendant's boss. They spent the night at the farm. Defendant and T.G. both slept in the living room. The room had two couches in front of a television. One couch was facing the television, the other was adjacent to that couch in an "L" formation. Defendant and T.G. were on the same couch, with defendant sitting straight up on the end, and T.G. lying on her side with her feet towards defendant. She fell asleep but awoke later to "a feeling there was something being pushed into [her] behind repeatedly in a thrusting manner." She was scared, so she started to move her legs as if she was stirring in her sleep. The feeling stopped briefly but began again shortly after. During this interaction, she heard defendant grunting. She then pretended to wake up. The movement again stopped. When she looked at defendant, he held up a television remote to her and asked if she wanted to change the channel. She then went to sleep on the other couch.

¶ 10    Defendant also would play a game with T.G. called "plug-the-hole." As a child, T.G. would pass gas on defendant and then run away. In response, defendant would play the "plug-the-hole" game, where he would place his hand up her butt to "plug the hole." This occurred "more than one time" during the time when defendant lived with T.G. and her family. In addition, there were often times where he would "miss" her butt and touch her vagina while playing the game. When this occurred, he would say "oops, wrong hole." This also occurred "more than one time" during the time when defendant lived with T.G. and her family.

¶ 11    While living with T.G. and her family, defendant was known for giving massages. He gave T.G. massages on many different occasions. The massage would start on the back, but he would move his hands to her lower back and sometimes her buttocks and inner thigh. Defendant would have T.G. remove her bra and massage underneath her clothing. The massages would generally occur in the living room and happened "more than one time." There was one instance where T.G.'s

father walked in on defendant massaging T.G. Defendant immediately stopped. T.G.'s father appeared suspicious but eventually left.

¶ 12    When T.G. was growing up, she had a friend named A.F., who would often sleep over at her house. A.F. spent the night while defendant and his family were living with T.G. and her family. One time, in 2012, A.F. spent the night and an incident involving defendant occurred. After dinner, T.G., A.F., and defendant watched a movie in the living room. All other members of the household were asleep.  T.G. and A.F. were lying on their stomachs on the floor. Defendant was between them, giving them back massages.

¶ 13    While giving the massages, defendant detailed his first sexual encounter: "69-ing" on a trampoline while at a party. The girls asked for clarification as to what "69-ing" meant. Defendant explained what it was. He also discussed his sexual preferences with the girls, saying, "it doesn't matter how flat a girl is, it's the pussy that matters." T.G. eventually fell asleep. When she awoke the next morning, A.F. was next to her and seemed concerned and uncomfortable. After that sleepover, A.F. grew distant. They did not see each other much, nor did they talk all that often. Defendant would often ask T.G. when A.F. would be coming over again.

¶ 14    After defendant moved out of T.G. and her family's home, T.G.'s mother explained why defendant had come to live with them. It was because defendant was charged with sexually abusing a child in De Kalb County.

¶ 15    T.G. first told her therapist, Dr. Erika Gray, about defendant's abuse in 2016. She didn't want to come forward to her mother because she had supported defendant through the De Kalb County allegations and she also did not want to break up the family. T.G.'s therapist reported the abuse and an investigation into the allegations was initiated.

¶ 16   Prior to T.G. speaking with an investigator, Dr. Gray told T.G.'s parents about the allegations. T.G.'s parents discussed them with T.G., and suggested that it was her medications making her think these things had happened.

¶ 17   T.G. spoke with an investigator from the Kane County Child Advocacy Center in 2016. She initially told them it hadn't happened, the antidepressants she was on made her mind foggy and that she must have imagined it. Her parents had pressured her into saying that. Additionally, she did not want to break up her family.

¶ 18   In 2020, T.G. came forward with the allegations again. She spoke with law enforcement and the instant case against defendant was filed. As a result, T.G. no longer speaks to that side of her family. She used to be really close with defendant's daughter, R.G., but no longer speaks to her.

¶ 19   Jeff G., T.G.'s father, testified next. He is defendant's brother. Over Memorial Day weekend 2012, defendant and his family moved in with Jeff and his family. They lived there until April 2015. During that time, T.G. would often spend time alone with defendant. They would often watch movies together, either in his bedroom or in the living room. At the time, Jeff did not have an issue with this. Growing up, T.G. had a friend named A.F. In May or June 2012, A.F. slept over at their house. Defendant was present in the home for this sleepover. Jeff observed defendant, T.G., and A.F. together in the living room.

¶ 20   The State called M.S. as their next witness. She testified as follows. She grew up in Sandwich, Illinois. In fourth grade, she was friends with defendant's daughter, Riley Grimmitt. She would often stay the night at Riley's house. When she would spend the night, defendant would touch her and try to get under her pants while she was sleeping. This happened roughly 10 to 15

times. Based on this conduct, defendant was charged with various sexual offenses in DeKalb County. The matter went to jury trial and defendant was ultimately found not guilty.

¶ 21    Dr. Ericka Gray testified as an expert in post-traumatic stress disorder (PTSD) next. She works as a licensed clinical psychologist in the Chicagoland area. She treated T.G. from 2016 to 2017 to address issues with anxiety and obsessive-compulsive disorder (OCD). She also treated T.G. again from 2019 to 2020. Her initial diagnosis was generalized anxiety disorder. Then, on September 11, 2020, she diagnosed T.G. with PTSD. Her original diagnosis was not PTSD because, although T.G. presented with symptomatology that fit the criteria for PTSD, she had not yet divulged a trauma. Later, when T.G. informed Dr. Gray of defendant's sexual abuse, she was able to diagnose T.G. with PTSD. It was Dr. Gray's opinion, based on her training, experience, and observations of T.G., that T.G.'s PTSD was the result of past sexual abuse. It was also Dr. Gray's opinion that it was not possible that T.G. made up the sexual abuse based on any medication T.G. had been taking.

¶ 22    Luree F., A.F.'s mother, was called as the State's next witness. She testified that while in the fifth grade, A.F. was good friends with T.G. They would often have playdates at T.G.'s home in Pingree Grove. They would also have sleepovers at T.G.'s home at least once a month. The last time A.F. slept over at T.G.'s house, A.F. seemed very quiet the next morning. That evening, A.F. told Luree that something had happened at the sleepover. Luree never allowed A.F. to sleepover at T.G.'s home again.

¶ 23    A.F. was called as a witness next and testified as follows. A.F. was born November 3, 2000. At the time of the trial, she was 23 years old. Growing up, she lived in Hampshire, Illinois. She went to elementary school with T.G. and they were friends. They were closest in the fifth grade and they would spend a lot of time together. She would often sleep over at T.G.'s house in Pingree

Grove. One instance, at the end of fifth grade or the summer after fifth grade, A.F. slept over at T.G.'s house and something happened. Defendant, A.F., and T.G. were in the living room watching the movie "Jackass" together. During the movie, defendant was explaining his first experience with oral sex to them. He explained that his first experience with oral sex was on a trampoline and he explained the pleasurable sensations he felt. Defendant then offered to give A.F. and T.G. massages. He gave T.G. a massage and then gave A.F. a massage. A.F. observed T.G. sleeping at this time. While massaging A.F., defendant began to touch, squeeze, and pinch A.F.'s breasts. He then removed her shorts and underwear and began to rub his fingers on her vagina. Eventually, he inserted his fingers into her vagina, moving them in and out repeatedly. During this encounter, A.F. felt confused and highly uncomfortable. To end the encounter, A.F. pulled her shorts and underwear back on, stood up, and went to the bathroom. While in the bathroom, A.F. wanted to talk to T.G.'s parents. She considered leaving the house but ultimately decided to leave the bathroom and lay back down in the living room.

¶ 24    When she returned, defendant again inserted his fingers into her vagina. This pattern repeated, with A.F. ending the encounter by going to the bathroom, returning to the living room, and then defendant again inserting his fingers into her vagina. She could not remember how many times it happened, but eventually, defendant moved to the couch and stopped touching her. A.F. said she was "certain that it happened more than two times," in reference to both the rubbing of her vagina and the insertion of defendant's fingers into her vagina.

¶ 25    The next morning, defendant was no longer in the living room. T.G. and A.F. got dressed and then A.F.'s mother picked her up later in the morning. After that sleepover, A.F.'s friendship with T.G. changed. They drifted apart. Largely because A.F. was reminded of the sleepover every time she looked at T.G. In March 2020, A.F. made contact with the Pingree Grove police

department to make a report. She decided to come forward to defendant herself and protect any other potential victims.

¶ 26 Lastly, the State moved two exhibits into evidence, defendant's certified driving abstract and A.F.'s school enrollment records. Then, it rested. Defendant made an oral motion for a directed verdict, arguing that the evidence elicited was insufficient to prove him guilty beyond a reasonable doubt. The trial court took the motion under advisement until the following morning and ultimately denied it.

¶ 27 Defendant then called Taylor Anderson as his first witness. She testified as follows. She had been friends with defendant for approximately 15 years. During that time, she had opportunity to observe defendant interact with T.G. She described their relationship as "obviously family, but then they had become friends." Taylor did not observe anything unusual in the relationship between defendant and T.G.

¶ 28 Defendant's next witness, Karen Kunz, testified as follows. Defendant is her brother-in-law. He is married to Karen's sister, Karol. While defendant and his family were living in Pingree Grove, she would visit them approximately twice a week. She had the opportunity to observe defendant interact with T.G. during these visits. She did not observe anything inappropriate between defendant and T.G. They had a "[t]ypical uncle/niece relationship."

¶ 29 Karol Grimmitt, defendant's wife, testified next. She and defendant had been married for 27 years. Together, they have two children, Riley and Kyle. From Memorial Day weekend of 2012 until late in 2015, their family lived with defendant's brother's family in Pingree Grove. During the time they lived in Pingree Grove, she did not recall an occasion where defendant slept anywhere other than in the basement with her. She also did not recall an occasion where T.G. had a sleepover with another little girl. One of the rules while they were living in the house was no

sleepovers allowed. Karol did not observe anything unusual about the relationship between defendant and T.G.

¶ 30    Defendant's last witness was Riley Grimmitt, defendant's daughter. She testified that defendant and T.G. had a close relationship. Defendant acted as another father figure for T.G. She did not observe anything inappropriate about defendant and T.G.'s relationship.

¶ 31    The State then called Gia Grimmitt, T.G.'s mother, in rebuttal. She testified that she did not have a "no sleepover" rule while defendant and his family resided with her. She also testified that T.G. had many sleepovers with A.F. during the time defendant was living with them.

¶ 32    Defendant re-called Riley Grimmitt in surrebuttal. She testified that Gia Grimmitt *had* enforced a "no sleepover" rule and had verbally told her of that when she had first moved in.

¶ 33    At this point, proofs were closed and defendant renewed his motion for a directed verdict. The trial court denied the motion. The State moved to dismiss count 17. The trial court granted the motion. The parties then proceeded to closing arguments. After deliberation, the jury found defendant guilty of the 16 remaining counts.

¶ 34    On December 14, 2023, defendant filed a "motion for a new trial." In it, he argued that the evidence presented at trial did not prove defendant guilty beyond a reasonable doubt. The trial court heard argument and ultimately rendered its written decision on the matter on March 7, 2024, finding that the evidence presented at trial was insufficient to prove defendant guilty beyond a reasonable doubt of counts 3, 5, 6, 10, 12, 14, and 16. The trial court took issue with the State's approach of asking a "catch-all question" after establishing the factual basis of a particular sexual encounter. *Supra* ¶¶ 10, 11, 24. For example, the State would ask: "Can you say with certainty that as far as the penetration you described, that that happened more than two times?" A.F. responded: "Yes, I can say for certain that it happened more than two times."

¶ 35    Ultimately, the trial court found that in regards to A.F., there was testimony of one incident of back touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 7), one incident of breast touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 8), one incident of vagina touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 4), and two incidents of defendant inserting his fingers into A.F.'s vagina (sufficient to prove defendant guilty beyond a reasonable doubt of counts 1 and 2). There was no testimony beyond the response to that "catch-all question" to support guilty verdicts on counts 3, 5, and 6. *Supra* ¶ 24. Accordingly, the trial court acquitted defendant on those counts.

¶ 36    Regarding T.G., the trial court separated her testimony into three categories: (1) the "plug the hole" game; (2) the back rubs; and (3) the couch. The trial court found that T.G.'s testimony about the "plug the hole" was sufficient to prove one instance of vagina touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 15) and one incident of buttocks touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 13). The trial court had the same issue with the "catch-all questions" as it had in A.F.'s testimony. *Supra* ¶ 10. Accordingly, the evidence was insufficient to prove defendant guilty beyond a reasonable doubt of counts 14 and 16.

¶ 37    The trial court found that T.G.'s testimony about the back rubs was only sufficient to prove one incident of buttocks touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 9) and one incident of inner thigh touching (sufficient to prove defendant guilty beyond a reasonable doubt of count 11). It again took issue with the "catch-all questions" asked, and found the evidence was insufficient to prove defendant guilty beyond a reasonable doubt of counts 10 and 12. *Supra* ¶ 11.

¶ 38    Lastly, regarding the couch incident at the farm belong to defendant's boss, the trial court found that the "testimony sound[ed] to be describing a penetration, but no other questions were asked and none of the charges on the Indictment reflected any other penetration counts." *Supra* ¶ 9. Accordingly, T.G.'s testimony about the couch incident was insufficient to prove defendant guilty beyond a reasonable doubt of any of the counts charged.

¶ 39    The matter was continued to April 3, 2024, for sentencing on counts 1, 2, 4, 7, 8, 9, 11, 13, and 15. On counts 1 and 2, the trial court sentenced defendant to 8 years' incarceration in the Illinois Department of Corrections, to be served consecutively to each other. On counts 4, 7, 8, 9, 11, 13, and 15, the trial court sentenced defendant to 4 years' incarceration, to be served concurrently to each other, but consecutively to the two 8-year sentences. Ultimately, defendant was sentenced to a total of 20 years' incarceration, with the first 16 years to be served at 85% and the remaining 4 years to be served at 50%.

¶ 40    On April 10, 2024, defendant filed his timely notice of appeal.

¶ 41                                II. ANALYSIS

¶ 42    At issue in this appeal is whether the defendant's constitutional right to be free from double jeopardy was violated. Defendant argues that because the trial court acquitted him on counts 3, 5, 6, 10, 12, 14, and 16, his fifth amendment rights were violated when he was sentenced on counts 1, 2, 4, 9, 11, 13, and 15, as the indictments for these counts contained identical language to the indictments for the counts on which defendant was acquitted. The State argues (1) that defendant forfeited that issue by failing to properly preserve it; and (2) that the counts on which defendant was sentenced did not constitute the same offenses as the counts defendant was acquitted of, so double jeopardy was not implicated. For the following reasons, we affirm.

¶ 43    We first address forfeiture. The State argues that to properly preserve an issue for review, a defendant must both raise an objection at trial and include the issue in a written post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 186. Defendant argues that the State's forfeiture claim is erroneous, and points this court to the following language in *Evans v. Michigan*, 568 U.S. 313, 326 (2013): "[t]o hold that a defendant waives his double jeopardy protection whenever a trial court error in his favor on a midtrial motion leads to an acquittal would undercut the adversary assumption on which our system of criminal justice rests, and would vitiate one of the fundamental rights established by the Fifth Amendment." Consequently, he argues, there is no theory of waiver or forfeiture available to the State on the issue of double jeopardy.

¶ 44    Defendant seems to fundamentally misunderstand *Evans*. In *Evans*, the issue before the Supreme Court was "whether retrial is barred when a trial court grants an acquittal because the prosecution had failed to prove an element of the offense that, in actuality, it did not have to prove." *Id.* at 317. The defendant in *Evans* was charged with arson. *Id.* at 315. At trial, the trial court entered a directed verdict of acquittal, based on the State failing to provide sufficient evidence of a particular element of the offense. *Id.* That element was not actually a required element at all. *Id.* The language cited by defendant is in response to the State's argument in *Evans* that because Evans induced the trial court's error by arguing in his motion for a directed verdict that the State failed to prove a non-essential element of the charged offense, he should not be permitted to claim double jeopardy when the error was corrected and the State then attempts to retry him. *Id.* at 326. That language has nothing to do with whether or not defendant properly preserved the issue of double jeopardy for appellate review. In fact, defendant cites to no case law standing for the proposition that neither an objection nor a written post-trial motion is needed in order to preserve the issue of double jeopardy for appellate review.

¶ 45    As defendant failed to raise an objection at trial or to include the issue of double jeopardy in a written post-trial motion, we may only review his appeal if he has established plain error. *People v. Hillier*, 237 Ill. 2d 539, 545. Defendant has not done so here, as he has failed to even argue plain error in his opening brief. *Id.* Where a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain error review. *Id.* at 545-46 (citing *People v. Nieves*, 192 Ill. 2d 487, 503-03).

¶ 46    Notwithstanding forfeiture, defendant's argument on appeal fails. We review issues involving the constitutional protection against double jeopardy *de novo*, as it presents a question of law. *People v. Prince*, 2023 IL 127828, ¶ 11. The double jeopardy clause of the fifth amendment to the United States Constitution provides that no person all "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Illinois Constitution of 1970 provides similarly that no person shall "be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10. In a case where a defendant is tried by a jury, as in here, jeopardy attaches when the jury is empaneled and sworn. *Martinez v. Illinois*, 572 U.S. 833, 839. Double jeopardy protection covers three distinct scenarios: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *People v. Henry*, 204 Ill. 2d 267, 283. As the State notes, defendant's opening brief fails to discuss these categories or provide any sort of guidance for this court as to what category applies here. However, his argument seems to best fit within the first scenario: a second prosecution for the same offense after acquittal.

¶ 47    Defendant argues that when the trial court acquitted defendant on counts 3, 5, 6, 10, 12, 14, and 16, it also resolved his culpability under each duplicate or triplicate counts (counts 1, 2, 4, 9, 11, 13, and 15). Therefore, defendant was technically also acquitted on counts 1, 2, 4, 9, 11, 13,

and 15, and his fifth amendment rights were violated when he was sentenced on those counts. He cites to no authority standing for this. Instead, he relies on *People v. Cervantes*, 2013 IL App (2d) 110131, which he miscites in his brief. Regardless, *Cervantes* is easily distinguishable from the case at bar.

¶ 48    In *Cervantes*, defendant was charged with armed violence, unlawful possession of a controlled substance with intent to deliver within 1,000 feet of public housing (720 ILCS 570/407(b)(1) (West 2008)), unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2008)), unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2008)), unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2008)), and unlawful possession of cannabis (720 ILCS 550/4(d) (West 2008)). *Cervantes*, 2013 IL App (2d) 110131, ¶ 3. After a bench trial, the trial court acquitted Cervantes of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2008), noting (albeit mistakenly) that this acquittal required findings of not guilty on counts 1 and 2: armed violence and unlawful possession of a controlled substance with intent to deliver within 1,000 feet of public housing (720 ILCS 570/407(b)(1) (West 2008). *Id.* ¶ 8. Later, it was adduced that the trial court had mistakenly acquitted defendant of armed violence, believing the predicate felony was unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2008). *Id.* ¶ 11. The trial court then found defendant guilty of armed violence and sentenced him on that. *Id.* The issue in *Cervantes* was whether the trial court violated double jeopardy principles when it mistakenly announced defendant not guilty of armed violence but then convicted and sentenced him. *Id.* ¶ 21. The *Cervantes* court relied on *Evans* and held that double jeopardy barred the trial court from convicting and sentencing defendant of armed

violence. *Id.* ¶ 61. An acquittal based on "an egregiously erroneous" foundation was nevertheless an acquittal for double jeopardy purposes. *Id.* ¶ 48.

¶ 49    Here, the key difference is that no judgments of acquittal were entered on counts 1, 2, 4, 9, 11, 13, and 15—erroneously or otherwise. Defendant cites to no cases that suggest than an acquittal on one count operates as an acquittal on another count containing identical language. Defendant's reliance on *Cervantes* is misplaced.

¶ 50    Defendant also argues that the only difference between the counts on which defendant was sentenced and the counts defendant was acquitted was the "count number" at the top of the page of the indictment. However, this ignores the very definition of the word "count." Black's Law Dictionary defines "count" as "[t]he part of a charging instrument alleging that the suspect has committed a *distinct offense*." (Emphasis added.) Black's Law Dictionary (10th ed. 2014). Each count in the indictment represents a *distinct offense*, despite having identical language.

¶ 51    He goes on to argue that "[t]he same offense is the same offense, and the page number appearing on the page above the charge of the same offense is of no constitutional consequence." Again, defendant provides no case law to support this contention. He states that "the distinction of a count or page number is truly a distinction without a difference" and confusingly quotes *Evans* and *Cervantes*: "This is far too fine a distinction to be meaningful." *People v. Cervantes*, 2013 IL App (2d) 110191, ¶ 39 (quoting *Evans*, 568 U.S. at 322). The distinction discussed in *Evans* was between a misconstruction of a statute and the erroneous addition of an extraneous element to a charged offense. *Id.* Neither *Evans* nor *Cervantes* discusses the distinction of a count or page number on a charging document.

¶ 52    Defendant next rebuts the argument he anticipates the State to make: that defendant is not protected by the double jeopardy clause because the trial court made a legal error in entering an

acquittal having unintended consequences. He argues that regardless of any legal error made by the trial court, the acquittals on counts 3, 5, 6, 10, 12, 14, and 16 operated to also acquit defendant on counts 1, 2, 4, 9, 11, 13, and 15. Defendant misses the point. Here, there was no legal error made by the trial court. Rather, the trial court entered judgments of acquittal on certain counts but not others. The acquittals on counts 3, 5, 6, 10, 12, 14, and 16 *did not* operate to acquit defendant on counts 1, 2, 4, 9, 11, 13, and 15. Each count represents a distinct offense. In pursuing this line of argument, defendant seems to ignore the language of the trial court's ruling: "I find the evidence presented at trial is insufficient to prove the defendant guilty of Counts 3, 5, 6, 10, 12, 14, and 16. *I find the evidence at trial sufficient to prove the defendant guilty beyond a reasonable doubt of Counts 1, 2, 4, 7, 8, 9, 11, 13, 15, and 17.*" (Emphasis added.) Additionally, throughout the proceedings, the trial court clarified that each count constituted a separate act. The record is clear that each of the 17 counts charged constituted a separate act, and therefore, they were not the identical offense for double jeopardy purposes. See *People v. Foster*, 2022 IL App (2d) 210556-U, ¶ 114 (identical charges in an indictment not improper where there is evidence and argument to support a finding of multiple acts).

¶ 53    After briefing, defendant filed two motions for leave to cite additional authority, which we granted. First, defendant cites to one line in the special concurrence of *People v. Johnson*, 2025 IL 130447:

> "As the State correctly notes, the statute's purpose of ensuring that a defendant is not convicted based on insufficient evidence is achieved regardless of when the court enters the judgment of acquittal—a defendant is equally acquitted whether the judgment of acquittal is entered immediately after the close of the State's evidence, after the close of all

the evidence, or after the jury has returned its verdict." *People v. Johnson*, 2025 IL 130447, ¶ 70.

We do not find *Johnson* to be useful here. The issue in *Johnson* was whether a trial court must decide a defendant's midtrial motion for a directed verdict before proceeding to the defense's evidence. *Id.* ¶ 1. The special concurrence's comments were in reference to the fact that the plain language of 725 ILCS 5/115-4(k) does not specify *when* during a trial the court must enter a judgment of acquittal. Here, we do not have any issue regarding the timing of defendant's acquittals on counts 3, 5, 6, 10, 12, 14, and 16. Rather, defendant is claiming, in error, that the acquittals on counts 3, 5, 6, 10, 12, 14, and 16 operated to acquit defendant on counts 1, 2, 4, 9, 11, 13, and 15. This is simply not the case.

¶ 54    Next, defendant cites to *People v. Lagrone*, 2025 IL App (2d) 230543, and cases cited therein, pointing this court to the following language: "the State must show its intent to apportion separate acts to separate charges." *People v. Lagrone*, 2025 IL App (2d) 230543, ¶ 106. He also cites *People v. Crespo*, 203 Ill. 2d 335: "Today's decision merely holds that in cases such as the one at bar, *the indictment must indicate that the State intended to treat the conduct of defendant as multiple acts in order for multiple convictions to be sustained.*" (Emphasis added.) *People v. Crespo*, 203 Ill. 2d 335, 345. He then goes on to argue that the indictments here made no effort to apportion separate acts to separate charges.

¶ 55    We have previously rejected such application of *Crespo* in a similar sexual abuse case. In *People v. Marcos-Tilapa*, defendant was charged in a nine-count indictment with sexually abusing his minor niece. *People v. Marcos-Tilapa*, 2017 IL App (2d) 150464-U, ¶ 4. Counts 4 and 7 alleged that between March 1, 2012, and February 1, 2013, defendant knowingly touched the sex organ of the victim for the purpose of his sexual gratification. *Id.* Counts 5 and 8 alleged that between March

1, 2012, and February 1, 2013, defendant knowingly touched the buttocks of the victim for the purpose of his sexual gratification. *Id.* Defendant, relying on *Crespo*, argued that his convictions for aggravated criminal sexual abuse as charged in counts 7 and 8 must be vacated because the indictment failed to distinguish between separate acts that could support multiple convictions. *Id. ¶* 10. We distinguished *Crespo*, as the concern in that case was "the State's treatment of three closely related acts as one act in the indictment, and at trial, then changing course on appeal to contend that the three acts were separate and would support three separate convictions." *Id. ¶* 13. Here, as in *Marcos-Tilapa*, the State's treatment of the charges against defendant has been consistent throughout the pendency of these proceedings.

¶ 56    We additionally find *Lagrone* to be distinguishable from the instant case. As defendant noted in his motion to cite additional authority, *Lagrone* involves the one-act, one-crime rule—not double jeopardy. *Lagrone*, 2025 IL App (2d) 230543, ¶ 104. Further, the issue in *Lagrone* was whether the defendant's conviction of aggravated domestic battery and her conviction of armed violence stemmed from the same physical act. *Id. ¶¶* 109-111. Because the language of the indictment failed to apportion separate stab wounds to each offense, we found that the State treated the stabbing as a single occurrence. *Id.* Therefore, the stabbing could only sustain one conviction, either aggravated domestic battery or armed violence. *Id.* Not both. *Id.*

¶ 57    Here, we do not have a situation where defendant is claiming that the State convicted him of multiple offenses based on the same act. Rather, defendant is claiming that the acquittals on counts 3, 5, 6, 10, 12, 14, and 16 operated to acquit defendant on counts 1, 2, 4, 9, 11, 13, and 15. Accordingly, *Lagrone* does not control the outcome of this case.

¶ 58    Under defendant's theory, it would be virtually impossible to charge and convict an individual of multiple counts of criminal sexual assault that occurred within the same period of

time. This completely ignores the nature of sexual crimes. "In the instance of offenses involving sexual assault, a defendant may be convicted on each act of penetration." *People v. France*, 2025 IL App (5th) 220140-U, ¶ 65. Defendant seems to expect a victim of a sexual crime to know down to the minute when each distinct sexual crime occurs, so that a prosecutor may then include a distinct time for each crime, to differentiate the counts on the charging document. This is obviously absurd. Although the State could have utilized a bit more care when crafting the indictment language, it was clear throughout the proceedings that each count represented a distinct offense. Even defendant's trial counsel during closing arguments acknowledged that each of the 16 counts constituted separate offenses that must be proven beyond a reasonable doubt. Defendant's argument on appeal fails and we affirm.

¶ 59                                    III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 61    Affirmed.